LIZETTE JACQUES ET AL. *v.* MAUREEN A. CASSIDY ET AL.

SUPERIOR COURT        HARTFORD COUNTY        FILE No. 156170

Memorandum filed July 11, 1969

*Rabinowitz, Scoler & Rosen,* of Hartford, for the plaintiffs.

*Day, Berry & Howard,* of Hartford, and *O'Neill, Steinberg & Lapuk,* of Hartford, for the defendants Maureen A. Cassidy and Jeannette M. Cassidy.

*Robinson, Robinson & Cole,* of Hartford, for the defendants Michael C. Jacques and Priscilla Jacques.

RUBINOW, J. In this action, the complaint alleges that on July 8, 1967, Lizette Jacques and Dianne Jacques, hereinafter referred to as the plaintiffs, sustained injuries as a result of the collision between the automobile they were riding in and an automobile operated by Maureen A. Cassidy and owned by Jeannette M. Cassidy, hereinafter referred to as the defendants. On January 21, 1969, the plaintiffs filed a motion for disclosure and production, requesting that the court order the defendants to produce "[a]ny signed statements, or copies thereof, which are not the result of the activities of counsel, or by direction of counsel, of the said defendant operator to [her] representatives, or agents, concerning the accident described in the . . . complaint." The defendants seasonably objected to this motion on the ground that "the plaintiffs seek confidential information, given with the assurance it would be used only by the defendants' attorneys in defense of the claim, which is part of the defendants' work product. The plaintiffs may have access to the defendants' work product and the benefit of the defendants' costly investigation only after a showing of good cause. No cause in this action can be advanced to justify the plaintiffs' invasion of the defendants' file."

On February 17, 1969, after a hearing on this objection, the court entered an order overruling the objection and ordering the defendants to produce the requested statements "subject to the following conditions: (1) The defendants are excused . . . from producing any items that are privileged from production under the work-product privilege or the attorney-client privilege. (2) If

the defendants claim that either, or both, of said privileges warrant their . . . not producing any item, they shall include the following statement as part of their disclosure: 'The work-product privilege or the attorney-client privilege is claimed as to all other matters that would otherwise be subject to disclosure . . . .' "

In response to this order, the defendants filed a disclosure and stated, with respect to the plaintiffs' request for production of the statement of the defendant operator, "The signed statement of the defendant was taken for the purpose of preparing a defense for trial and is the work product of the defendant." After the filing of this disclosure, the plaintiffs moved for a default for failure to comply "with the plaintiffs' motion for disclosure and production," and the defendants thereupon filed an objection to this motion for default, claiming that their disclosure complied with the order of the court of February 17, 1969.[1]

To bring before the court the circumstances under which the defendant operator's statement was taken, the parties filed a stipulation. Summarized, the stipulation sets forth the following: On October 31, 1967, the defendants' insurer was notified that a personal injury claim was being made by passengers in the automobile operated by the defendant operator. On November 3, 1967, a claims adjuster of the defendants' insurer obtained a written statement from the defendant operator in which she stated that she was involved in an automobile accident on July 8, 1967. On February 19, 1968, the plaintiffs' attorney notified the defendant owner that a personal injury claim was being made by the

---

[1] As to the propriety of filing such an objection, see *Kiessling* v. *Kiessling*, 134 Conn. 564, 568 (answer to motion for default held "unnecessary" and "properly expunged").

plaintiffs in connection with the accident. On May 27, 1968, the insurer requested the present attorneys for the defendants to represent the defendants in companion actions brought against them on behalf of all of the claimants.

## I

In their brief in support of their contention that the statement of the defendant operator is work product, the defendants make the claim that "all investigation conducted by the defendants or their representatives in preparation [for] trial is included within the meaning of work product." The question raised by this claim is whether work product that is not the work product of an attorney is within the work-product privilege enunciated by the Supreme Court of the United States in *Hickman* v. *Taylor*, 329 U.S. 495. The background and rationale of that case have been well summarized as follows: "Soon [after the adoption of the Federal Rules] a tension developed between two large objectives of the litigation process—on the one hand, truth-finding; on the other hand, preserving a role for the lawyer as a responsible champion of one side in a contest between adversaries. A dramatic collision occurred every time one side asked to discover work done by the other side in preparation for trial. The attorney against whom the discovery effort was made objected that his files were private, that litigation was an arm's-length affair, and that he ought not to be made to reveal the product of his thought and labor to the other party, who was bent on defeating his client. In the first decade after promulgating the original Rules, the Supreme Court was given a major opportunity to resolve the dilemma raised by the conflicting desires to get at the truth and yet preserve the adversarial system. The chance came in the case of *Hickman* v. *Taylor*

. . . . In the Supreme Court of the United States Mr. Justice Murphy let it be known that the Court was basically not lacking in sympathy for the idea that material of this kind [written statements by witnesses and notes of oral statements] might be discoverable. He said: 'Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession . . . . Civil trials in the Federal courts no longer need be carried on in the dark.' This leaves no doubt that as of 1946 the era of open poker in Federal civil litigation had arrived. Lawyers were no longer required to play their cards close to the chest. No more is the better player to win the pot with the worse hand. Now the better hand will always win. Mutual knowledge of all the relevant facts will come to the surface. The truth will out. But despite all this, the materials in *Hickman* were held not to be discoverable. Lawyers were told they did not have to surrender either kind of statement—not the written statements given to Mr. Fortenbaugh [defense counsel] by survivors and not the notes he had made on the basis of oral statements. Mr. Justice Murphy explained why: It would have a 'demoralizing' effect on the legal profession to compel a lawyer to work, as it were, in a goldfish bowl as he went about the preparation of his case. It would undermine the privacy a lawyer needs in order to function properly, if all his work and preparation were to be done with his opponent, in effect, present and looking over his shoulder." Rosenberg, "Changes Ahead in Federal Pretrial Discovery," 45 F.R.D. 481, 484.

Although, as the preceding comment shows, *Hickman* was primarily concerned with the privilege to be accorded to the work product of lawyers, in

*Alltmont* v. *United States*, 177 F.2d 971, 976, the United States Court of Appeals for the Third Circuit held that the rationale in *Hickman* "has a much broader sweep and applies to all statements of prospective witnesses which a party has obtained for his trial counsel's use. . . . [W]e can see no logical basis for making any distinction between statements of witnesses secured by a party's trial counsel personally in preparation for trial and those obtained by others for the use of the party's trial counsel." On the other hand, in *De Bruce* v. *Pennsylvania R. Co.*, 6 F.R.D. 403, 404, a more restricted view of the *Hickman* privilege was adopted: "Throughout the [*Hickman*] opinion at every point at which occasion arose the Court explicitly stated that what was under review was discovery procedure directed to the disclosure of statements obtained by the attorney for his client in preparation for trial. At the heart of the opinion lies a discussion by the Court of the historical function and status of a lawyer which is far too strongly emphasized to admit of the inference, which the defendant draws, that the Court meant to rule upon any question unconnected with the lawyer's part in the judicial process."

The narrower concept of the work-product privilege expounded in *De Bruce*, i.e. the privilege is limited to work product of lawyers, has been approved by leading commentators on federal practice, such as James (James, Civil Procedure § 6.9, p. 205) and Moore (4 Moore, Federal Practice § 26.23, p. 1383 [2d Ed.]). It has also been approved by the Connecticut Supreme Court in *Stanley Works* v. *New Britain Redevelopment Agency*, 155 Conn. 86, 95: "This lack of involvement of counsel is also dispositive of the claim that the reports were a 'work product.' 'Work product can be defined as the result of an attorney's activities when those

activities have been conducted with a view to pending or anticipated litigation.' . . . The attorney's work must have formed an essential step in the procurement of the data which the opponent seeks, and the attorney must have performed duties normally attended to by attorneys."

Thus, in this state, *Stanley Works* has resolved the conflict between *Alltmont* and *De Bruce* with respect to the scope of the work-product privilege in favor of the restricted view of the latter. On the authority of *Stanley Works,* accordingly, the court holds that, in the instant case, the "lack of involvement of counsel" bars the application of the work-product privilege to the defendant operator's statement.

## II

A further claim made by the defendants is that there has been no "showing" of "good cause." See Practice Book § 168. This claim presents a two-part question: First, what is "good cause"? Second, how does a party "show" good cause?

In cases decided under the Federal Rules, the interpretations of "good cause" have covered a wide spectrum. At one time, some courts held that the phrase means "no more than relevance to the subject matter of the action" (Freund, "Work Product," 45 F.R.D. 493, 495), but this view is no longer tenable in view of the decision in *Schlagenhauf* v. *Holder,* 379 U.S. 104, 118. Other courts have required only that they be "satisfied that the production of the requested document is necessary to enable a party to properly prepare his case, or that it will facilitate proof or progress at the trial." *Schuyler* v. *United Air Lines, Inc.,* 10 F.R.D. 111, 113. Still other courts have set up stringent criteria. See cases cited in 28 U.S.C.A. 37 (note 27 to Rule

34) and in 18A Words & Phrases 56 (Perm. Ed.). The reason for this diversity in holdings is that "[a]lthough the rules establish it ["good cause"] as a standard, it has no frame of reference. The court's decision, therefore, ultimately is no more than a comparative evaluation of competing claims of need and prejudice." *United Air Lines, Inc.* v. *United States,* 26 F.R.D. 213, 217.

Unlike the Federal Rules, our rules do establish a "frame of reference" for "good cause." In the second paragraph of Practice Book § 168, the rules provide that "good cause" shall include a showing that the disclosure sought "(a) would be of assistance in the prosecution or defense of such action, and (b) if not within the exclusive knowledge or power of the party sought to be interrogated, can be provided by such party with substantially greater facility than it could be otherwise obtained by the moving party." These subparagraphs (a) and (b) of Practice Book § 168 were adopted in 1955 (19 Conn. L.J., No. 23, p. 1 [Feb. 8, 1955]) as part of what has been called the "1955 revolution" in our discovery procedure. See Margolis, "A Uniform Motion for Disclosure in Negligence Cases," 37 Conn. B.J. 127, 134. This revolution resulted from "the discontent of the bar with the metes and bounds of discovery at law . . . . Annual meetings of the bar, committee meetings and reports, and surveys by way of questionnaires, increasingly reflected a ferment over the need for liberalization." Id., p. 132. With this background, these subparagraphs of Practice Book § 168 should be interpreted literally, to further the purposes of discovery rather than to perpetuate the limitations on it that caused the revolution.[2] These "broad purposes of modern discovery call for full disclosure of all facts and

---

[2] For a discussion of those limitations, see James, Civil Procedure, p. 181.

tangible things which will have any legitimate bearing on the controversy and might lead to its disposition." James, Civil Procedure § 6.8, p. 199.

In certain respects, our rules concerning discovery have not gone so far as the Federal Rules, e.g., our rules on depositions. On the other hand, Practice Book § 168 has gone even further than the Federal Rules in the sense that it has set up in subparagraphs (a) and (b) a standard of "good cause" which is much more liberal than that to be found in many of the cases decided under Rule 34 of the Federal Rules. Our liberal standard is made up of two components. The first, provided for in subparagraph (a), requires only that the material sought aid the moving party in the prosecution or defense of the action. Thus, under this component, the moving party is not required to prove that the material sought will be admissible or even relevant, if the material sought will help the moving party to uncover other facts which are relevant. See James, op. cit., p. 201. Except as limited by subparagraph (b), the effect of subparagraph (a) is to replace the previous limited grounds for ordering discovery with an entirely different ground —assistance to a party in prosecuting or defending an action. It is, perhaps, worth noting that this reference in subparagraph (a) to both prosecution and defense makes it clear that discovery is equally available to both sides and that the same principles and standards apply to both. "Discovery, in other words, is not a one-way proposition." *Hickman* v. *Taylor,* supra, 507.

As just noted, the ground for discovery set up in subparagraph (a) is limited by subparagraph (b). The latter sets forth, in the alternative, the second required component of "good cause." One of these alternatives, implied from the introductory clause of subparagraph (b), is that if the disclosure sought

is "within the exclusive knowledge or power of the party sought to be interrogated," there is "good cause" within the meaning of subparagraph (b). This implication in subparagraph (b) is a recognition and modification of the rule in *Downie* v. *Nettleton*, 61 Conn. 593, 595, where the court held that the matter sought by discovery had to be within the exclusive knowledge or power of the party sought to be interrogated.

The other alternative component of "good cause" set forth in subparagraph (b) is that there is "good cause" in cases where the matter sought is not within the exclusive knowledge or power of the adverse party, if the disclosure sought "can be provided . . . [by the party sought to be interrogated] with substantially greater facility than it could be otherwise obtained by the moving party." Under this component, the test is, on the one hand, the ease or difficulty with which the material sought can be "provided," and, on the other, the ease or difficulty with which it can be "obtained." Since, as previously noted, Practice Book § 168 was adopted to liberalize our discovery procedures, the court, in applying this test, should use standards which will effectuate, rather than frustrate, the purpose for which the subparagraph was adopted. Specifically, "substantially greater facility" should not be interpreted so as to require the moving party to prove that it is impossible or even difficult for him to obtain the information. If it is easier—to a substantial degree—for the other party to provide it, that is all that phrase of subparagraph (b) requires.

With respect to the defendant operator's statement of November 3, 1967, the only inconvenience which the defendants would sustain in making the statement available would be that resulting from

either making a copy or permitting the plaintiffs to make a copy. On the other hand, to obtain the statement from the defendant operator, even if plaintiffs' counsel were permitted to communicate with her, would require the involvement of either counsel for the plaintiffs or someone employed by him. On this comparison, the ease with which a copy of the statement can be "provided" by the defendants constitutes "substantially greater facility."

Further, the foregoing presupposes that the person who gave the statement will be able to recall what was said or to furnish his copy of the statement. See General Statutes § 52-147. If the declarant has to rely on his memory, it may well be argued that this is not a substitute for the statement itself.[3] If the declarant is able to furnish a copy of the statement to the moving party, the net result is that there has been accomplished, by correspondence or a personal interview, only the same thing that could have been accomplished by the simple process of providing a copy of a statement already made or permitting the statement to be copied. The latter alternatives, as the court has previously noted, constitute "substantially greater facility."

There are two additional comments which should be made with respect to the statement of a party such as is involved here. The first is that there is a sound basis for a claim that the defendant operator's statement is "within the exclusive knowledge or power of the party sought to be interrogated," because it would be improper for plaintiffs' counsel to question the defendant operator in anything less than a deposition setting, which would bring with it the likelihood of claims of limitation on the scope

---

[3] "I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory, ever bestowed on mortal man." *Lumpkin, J.,* in *Miller* v. *Cotten,* 5 Ga. 341, 349.

of the inquiry. Cf. *George A. Fuller Co. v. Controlled Weather Corporation,* 27 Conn. Sup. 38 (subpoena duces tecum cannot be issued in connection with deposition of party under Practice Book § 185); Canons of Professional Ethics, No. 9, Practice Book, p. 5 ("A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel").

The second comment is that the statement sought, in addition to being within the exclusive knowledge or power of the defendants, is admissible in evidence as an admission. Since the statement is admissible, to deny the plaintiffs a copy of it would be to thwart a principal reason for allowing discovery. "The strongest case for discovery seems to be when one party has admissible evidence which is unavailable to his opponent." "Developments in the Law—Discovery," 74 Harv. L. Rev. 940, 1036. "[A] party's statement . . . is an evidentiary document constituting an 'admission.' Clearly the latter should be open and known to both sides." Freund, "Work Product," 45 F.R.D. 493, 496; see James, Civil Procedure, p. 212 (parties' statements should be discoverable on ground of special necessity even if otherwise protected by work-product privilege).

### III

As noted previously, a second question posed by the defendants' claim is the meaning of the word "showing" in Practice Book § 168. There may be cases where only an evidentiary hearing can "show" what "good cause" is, but such a hearing is not required in all cases. See *Schlagenhauf v. Holder,* 379 U.S. 104, 119. "[I]n other cases the showing could be made by affidavits or other usual methods short of a hearing. . . . [T]he movant must produce sufficient information, by whatever means, so that the . . . judge can fulfill his function man-

dated by the Rule. Of course, there are situations where the pleadings alone are sufficient to meet these requirements." Ibid. In the latter category fall "certain somewhat standard situations which may carry their own showing of cause." *Currie* v. *Moore-McCormack Lines, Inc.,* 23 F.R.D. 660, 661. These "standard situations" have been recognized in such matters as requests for medical examinations of claimants in personal injury actions *(Schlagenhauf* v. *Holder,* supra) and, regarding documents, such matters as requests for doctors' reports, bills for "special damages," and hospital record authorizations. See Margolis, "A Uniform Motion for Disclosure in Negligence Cases," 37 Conn. B.J. 127, 134.

In the opinion of the court, the request for production of the defendant operator's statement is such a "standard situation." That such a statement will assist in the prosecution of the action is obvious; the ubiquity and economy of document-copying services do not have to be proved to the court; that these services can produce a copy of a statement within a fraction of the time and expense which would be required if either a lawyer or his investigator were to attempt to obtain the statement from the declarant, likewise does not require formal proof. "[A]s Justice Holmes noted, 'Judges need not be more naive than other men.'" *Johanek* v. *Aberle,* 27 F.R.D. 272, 278.

In sum, the court finds that the defendant operator's statement is not privileged from disclosure under the work-product rule; that the statement will aid the plaintiffs in the prosecution of their action; that it can be provided by the defendants with substantially greater facility than it could be obtained by the plaintiffs; and that, because it would be unethical for the plaintiffs to

attempt to obtain it by simply communicating with the defendant operator, it is within the exclusive knowledge or power of the defendants.

## IV

In their brief, the defendants argue that disclosure of the statements of witnesses and parties will discourage the investigation of claims and this, in turn, will reduce settlement possibilities and increase the volume of litigation. This argument seeks to nullify completely the provisions of Practice Book § 168 so far as they concern all trial-preparation papers and documents, for if those provisions do not apply to trial-preparation documents and papers in the possession or power of the defendants, they do not apply to trial-preparation documents and papers in the possession or power of the plaintiffs. In this area, there is no distinction in principle between the statement a witness has given to the defendant on the issue of liability and the statement a doctor has given to the plaintiff on the issue of damages.

Considering this subject apart from Practice Book § 168, Professor James has made a thorough analysis of the claim that trial preparation will be adversely affected by permitting disclosure of statements which are not the work-product of attorneys. In his view, "Discovery of trial preparation might possibly discourage such preparation in either or both of two interrelated ways: through a party's fear that his own discovery might help his adversary or through a party's hope that his adversary's preparation might make his own unnecessary—the hope, to put it colloquially, of getting a free ride." James, Civil Procedure, p. 206. In his opinion, "It is doubtful whether either the fear or the hope will seriously discourage effective and thorough trial preparation." Ibid. The fear that a party's own

discovery will help the adversary is not likely to discourage trial preparation, because, he points out, "[N]o party can afford to forego the kind of preparation he believes is needed. In accident cases it is typically on defendant's side that full-scale investigation is first made, and defendant must know the facts as they are likely to appear at trial to make a useful evaluation of the case for settlement and trial purposes, and he will not risk trial without such preparation. Moreover, he will be unwilling to let his adversary get to the witnesses first if this can be helped, since the first approach may give valuable psychological advantage even where all parties are acting in good faith. It may be suggested that fear of discovery might prompt an investigator to omit from statements which he takes those facts which favor the adversary, but this is unlikely. A party needs written statements signed by the witnesses to tie them down to their early, presumably unrehearsed, versions of the occurrence, and this purpose contemplates the possible use of a statement at trial for impeachment purposes if a witness should change his story. But if it appears at the trial that the investigator omitted from the statement unfavorable facts which the witness told him, then the value of the statement is likely to be destroyed and the investigator's side seriously prejudiced in the eyes of the trier of fact." Ibid.

With respect to the argument that a party will be tempted to take a "free ride" and await the result of his adversary's preparation, Professor James makes two points. First, although it is "unsportsmanlike" for one party to have the use of another party's labors, "this consideration is probably outweighed by society's paramount interest in seeing that cases are decided on their merits. This social interest transcends the sportsman's concept

that the race should be to the swift and the strong, and the social interest can best be served under an adversary system by equalizing, as nearly as may be, the adversaries' opportunities for knowledge of and access to facts." Id., p. 207. His second point is: "A vigorous and immediate investigation is likely to yield benefits which the adversary cannot fully capture by discovery. Failure to investigate in this way independently is more likely to result from lack of means or opportunity than from a calculated choice to depend on disclosure of the adversary's investigation. It follows that full mutual disclosure of statements of witnesses probably will not discourage full pretrial preparation where it would otherwise take place. Rather it will tend to minimize the inequalities which impede the effectiveness of the adversary system in producing judgments on the merits." Ibid.

It is noteworthy that Professor James's analysis reaches conclusions which do not agree with the position of the defendants. Suffice it to say that if experience under Practice Book § 168 produces consequences which cast doubt on his conclusions, the proper remedy is to revise Practice Book § 168 rather than to disregard it.

## V

As noted previously, the defendants also contend that disclosure of the statement should not be ordered because it was "confidential information, given [by the defendant operator] with the assurance that it would be used only by the defendants' attorneys in defense of the claim." There is no merit to this contention. The law accords no blanket privilege to confidential communications. "[T]he mere fact that a communication was made in express confidence, or in the implied confidence of a confidential relation, does not create a privilege." 8

Wigmore, Evidence § 2286, p. 528 (McNaughton Rev. 1961). If the rule were otherwise, all communications could be insulated from either testimonial disclosure or disclosure by discovery by the simple process of having them made in confidence. Although testimonial privileges which are recognized in trials are recognized in discovery [see *Skinner* v. *Judson,* 8 Conn. 528, 533], a confidential communication is immune from discovery on the ground of confidentiality only if it is the type of confidential communication to which the law accords the status of a communication privileged from disclosure. See *Stanley Works* v. *New Britain Redevelopment Agency,* 155 Conn. 86, 94. No such privilege attaches to communications from an insured to his insurance carrier.

## VI

The remaining question is whether the plaintiffs' motion for default should be granted. The rules (Practice Book § 172) provide that a default may be entered if a party has "failed to answer interrogatories . . . or has failed otherwise substantially to comply with any order for disclosure . . . made pursuant to Sec. 171." There are alternative reasons why the court would not at this point be justified in entering a default under those provisions. First, as the defendants have contended, the default should not be entered because they have complied with the order of the court entered on February 17, 1969. That order, although overruling the objections of the defendants, expressly provided that the defendants could make a claim of the work-product privilege in their disclosure, and this they have done, with even greater specificity than the order required. In a literal sense, then, the defendants have not "failed otherwise substantially" to comply with the order. Second, even if the court's

order had not specifically alluded to the claim of work-product privilege, nonproduction should not be considered "failure" to comply with the order of the court. The defendants' "failure" to produce the defendant operator's statement was not due to "willfulness, bad faith or any fault" *(Societe Internationale* v. *Rogers,* 357 U.S. 197, 212) but to a claim of the work-product privilege, made in good faith and vigorously urged by brief. Nonproduction under those circumstances does not constitute a "failure" to comply within the purview of Practice Book § 172. See *Societe Internationale* v. *Rogers,* supra.

The motion for default is denied.

Pursuant to Practice Book § 171, the defendants are ordered within three weeks from the date hereof to produce the statement of defendant Maureen A. Cassidy of November 3, 1967.